# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

### 2025 ND 28

In the Interest of B.V., a child

| | |
|---|---|
| State of North Dakota, | Petitioner and Appellee |
| v. | |
| B.V., a child; L.T., mother, | Respondents |
| and | |
| B.V., father, | Respondent and |
| Appellant | |

### No. 20240315

In the Interest of B.V., a child

| | |
|---|---|
| State of North Dakota, | Petitioner and Appellee |
| v. | |
| B.V., a child; L.T., mother, | Respondents |
| and | |
| B.V., father, | Respondent and |
| Appellant | |

### No. 20240316

Appeal from the Juvenile Court of Rolette County, Northeast Judicial District, the Honorable Anthony S. Benson, Judge.

AFFIRMED.

Opinion of the Court by Jensen, Chief Justice.

Brian D. Grosinger, State's Attorney, Rolla, ND, for petitioner and appellee; submitted on brief.

Ulysses S. Jones, Devils Lake, ND, for respondent and appellant; submitted on brief.

**Interest of B.V. and B.V.**
**Nos. 20240315 and 20240316**

**Jensen, Chief Justice.**

[¶1] B.V. appeals from an order terminating his parental rights. B.V. argues the juvenile court erred in finding the Mountain Lakes Human Service Zone ("Zone") engaged in active efforts to prevent the breakup of an Indian family as required under the Indian Child Welfare Act ("ICWA"). B.V. also argues the State failed to prove beyond a reasonable doubt that continued custody by B.V. would likely result in serious harm to his children. We affirm.

I

[¶2] B.V. and L.T. are the parents of B.V. and B.V. ("the children"). The Zone removed the children from B.V. and L.T.'s home in February 2021 in response to the children being left at a crime scene and unattended for 13 hours. B.V. was arrested for attempted murder and burglary. L.T. could not be located. A temporary custody order was issued to the Zone on February 24, 2021.

[¶3] B.V. was convicted of the two charges on January 20, 2023, and was sentenced to 20 years with 11 years suspended. His estimated release date is January 2030. L.T. has not had contact with the Zone since the termination of parental rights petition was filed.

[¶4] On October 14, 2021, the children were adjudicated children in need of protection and a 12-month custody order was issued to the Zone. On November 11, 2022, a permanency hearing was held in which an additional 6-month custody order was issued. In April 2023, the children were taken to Arizona by their maternal aunt and an interstate compact on the placement of children ("ICPC") was initiated. L.T. also relocated to Arizona. While in Arizona, she received permanency safety funds, her rent was paid for, she was provided a bus card, and in-home visitation of her children was provided. The ICPC was unsuccessful, and the children returned to North Dakota on September 22, 2023. When the children returned to North Dakota from placement, visitation was sporadically attempted by L.T., with the Zone losing all contact with her in

February 2024. Efforts to engage L.T. in completing the needed services were unsuccessful.

[¶5]   Between his arrest on February 21, 2021, and conviction on January 20, 2023, B.V. was in and out of custody. While out of custody, B.V. was offered supervised visitation with the children while the Zone completed its assessments and developed a case plan. The Zone did not have any record of contact from B.V. from January 2021 through May 2022. B.V.'s lack of contact with the Zone hindered their efforts on his behalf. The Zone attempted to work with B.V. towards the main goal of family reunification while actively pursuing an alternative plan in case reunification was not achievable within a reasonable timeframe.

[¶6]   The juvenile court made a number of findings regarding B.V. and B.V.'s lack of interaction with the Zone, including the following findings: B.V. had minimal insight into his behavior and any discussions with the Zone were superficial. The family has an extensive history with the Zone and B.V. was unwilling and unable to create a plan to keep his children safe if his criminal charges were dismissed. B.V. was unwilling to resolve the issues with the Zone and instead continued to maintain his innocence and claimed nothing needed to be done on his end. Brittany Hunt, a social worker assigned to the case, testified that it was B.V. who closed the door on receiving active efforts, not the Zone, due to his inability to move past the idea that the charges would be dropped. B.V., by his voluntary conduct in breaking the law resulting in his incarceration, derailed that assistance.

[¶7]   The findings included recognition that Hunt testified to the efforts the Zone made in finding relatives for the children to be placed with. The Zone explored guardianship and completed several relative searches and sent out hundreds of letters to relatives, which was unsuccessful. B.V. offered one family alternative, but due to the children's medical and behavioral needs, the family member did not believe she could meet their needs and never provided the Zone with a decision on whether she would be willing to care for them. The Zone also attempted placement with another child of B.V.'s but that was also unsuccessful.

[¶8] On October 18, 2024, the juvenile court ordered termination of B.V. and L.T.'s parental rights. L.T. has not appealed from that decision.

II

[¶9] Section 27-20.3-20(1), N.D.C.C., allows a juvenile court to terminate parental rights:

1. The court by order may terminate the parental rights of a parent with respect to the parent's child if:
   a. The parent has abandoned the child;
   b. The child is subjected to aggravated circumstances;
   c. The child is in need of protection and the court finds:
      (1) The conditions and causes of the need for protection are likely to continue or will not be remedied and for that reason the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; or
      (2) The child has been in foster care, in the care, custody, and control of the department or human service zone for at least four hundred fifty out of the previous six hundred sixty nights;
   . . . .

[¶10] The party seeking termination of parental rights "must prove all elements by clear and convincing evidence." *In re I.B.A.*, 2008 ND 89, ¶ 15, 748 N.W.2d 688. "Clear and convincing evidence is 'evidence that leads to a firm belief or conviction the allegations are true.'" *In re M.R.*, 2015 ND 233, ¶ 6, 870 N.W.2d 175 (quoting *In re T.A.*, 2006 ND 210, ¶ 10, 722 N.W.2d 548). A juvenile court's decision to "terminate an individual's parental rights is a question of fact, and that decision will not be overturned unless it is clearly erroneous." *Id*. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, no evidence exists to support it, or if it is clear a mistake has been made. *Id.*

[¶11] Because the children involved in this matter are enrolled members of the Turtle Mountain Band of Chippewa, ICWA, 25 U.S.C. § 1912 applies. ICWA, as codified by N.D.C.C. ch. 27-19.1, require specific findings:

The court may order the termination of parental rights over the Indian child only if the court determines, by evidence beyond a reasonable doubt that continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child.

N.D.C.C. § 27-19.1-01(4); *see* 25 U.S.C. § 1912(f).

[¶12] On appeal, B.V.'s only arguments are that the juvenile court erred in terminating his parental rights because (1) no active efforts to prevent the breakup of this Indian family were made; and (2) the testimony of the qualified expert witness was insufficient to satisfy the requirements of ICWA. B.V. does not dispute there was clear and convincing evidence that the children are in need of protection.

## III

[¶13] B.V. asserts there is no clear and convincing evidence to support a finding that active efforts were made to preserve his Indian family. Before removal of an Indian child from the custody of a parent or Indian custodian for purposes of involuntary foster care placement or the termination of parental rights over an Indian child, the juvenile court shall find:

> [T]hat active efforts have been made to provide remedial services and rehabilitative services designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. . . .

N.D.C.C. § 27-19.1-01(2); *see* 25 U.S.C. § 1912(d).

[¶14] ICWA has no exception for incarceration and neither incarceration nor doubtful prospects for rehabilitation will relieve the Zone of its duty under ICWA to make active efforts. *Doe v. State, Dep't of Health & Soc. Servs.*, 272 P.3d 1014, 1021 (Alaska 2012). "Active efforts are to be tailored to the facts and circumstances of the case." N.D.C.C. § 27-19.1-01(1)(a). Active efforts include:

> (1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal, with ongoing timely

assessment to determine when the threat is resolved and placement of the Indian child can be returned to the custodian.

(2)   Identifying appropriate services and helping a parent or Indian custodian to overcome barriers, including actively assisting a parent or Indian custodian in obtaining such services.

(3)   Identifying, notifying, and inviting representatives of the Indian child's tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues.

(4)   Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parent or Indian custodian.

(5) Offering and employing available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the Indian child's tribe.

(6)   Taking steps to keep siblings together, if possible.

(7)   Supporting regular visits with a parent or Indian custodian in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the Indian child.

(8) Identifying community resources, including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parent or Indian custodian or, as appropriate, the Indian child's family, in utilizing and accessing those resources.

(9)   Monitoring progress and participation in services.

(10) Considering alternative ways to address the needs of the Indian child's parent or Indian custodian and where appropriate,

the family, if the optimum services do not exist or are not available.

(11) Providing post-reunification services and monitoring.

N.D.C.C. § 27-19.1-01(1)(a); *see* 25 C.F.R. § 23.2.

[¶15] During the relevant period, the Zone attempted a trial home placement and ICPC in Arizona which was unsuccessful. The Zone offered B.V. supervised visits with his children which he failed to take advantage of from January 2021 through May 2022. The Zone attempted to regularly meet with B.V. and invited him to child and family team meetings. The Zone continued to try to assess B.V., however, B.V.'s interactions with the social workers whose efforts, he challenges, highlight his refusal to engage with services. He cannot now complain that assistance was not made available to him. *See In re E.R.*, 2004 ND 202, ¶ 13, 688 N.W.2d 384; *In re R.L.-P.*, 2014 ND 28, ¶ 34, 842 N.W.2d 889. When considering whether "active efforts" were made, we conclude a juvenile court may consider the parent's failure to participate.

[¶16] The Zone took seriously B.V.'s preference that his children be placed with members of his family, and it made active efforts to honor that preference. The Zone also conducted a search for extended family members, but none were available for placement.

[¶17] While there were periods of time the Zone did not have contact with B.V. and was unable to move forward with efforts to reunify B.V. with the children, those periods of limited contact were primarily the result of B.V.'s actions. We conclude there is evidence in the record to support the juvenile court finding that there was clear and convincing evidence the Zone made active efforts to prevent the breakup of the Indian family, the court did not misapply the law, and we are not left with a definite and firm conviction a mistake has been made. The finding that the Zone engaged in active efforts to preserve the Indian family was not clearly erroneous.

## IV

[¶18] B.V. also challenges the juvenile court's finding that there was substantial evidence from which a rational trier of fact could conclude, beyond a reasonable doubt, that continued custody of the children by B.V. would likely result in serious emotional or physical damage to the children. The court found:

> The need for protection will continue with regard to [B.V.] as he will be incarcerated for a number of years. The need for protection will continue with regard to [L.T.] as she has not demonstrated any ability to care for the children, the Zone believe[s] she may be homeless, they don't know her current location, which may well be in the southern United States at this point. The evidence is such that both parents are either unable or unwilling to provide the children with [a] safe and stable environment, or provide other care or control necessary for the children's well-being.
>
> [B.V.] is unable to provide for the children because of his incarceration at the North Dakota State Penitentiary, and the length of the sentence he has yet to serve. [L.T.] is unwilling to provide for the children as evidenced by her inaction and terminating contact with the Zone and the children. Without with [sic] ability or willingness to provide such care or control, the children are suffering and will continue to suffer serious physical, mental, moral, or emotional harm.

[¶19] There is evidence in the record to allow the juvenile court to rationally find, beyond a reasonable doubt, that continued custody of the children by B.V. would likely result in serious emotional or physical damage to them. B.V. is incarcerated and unable to provide a home for the children. The record supports the court's finding that the lack of stability and permanence would cause emotional damage. The record supports the court's finding that B.V. was unwilling to take accountability and address the issues raised by the Zone and work on a plan to keep the children safe in the future, and as a result the children would be subject to harm, either emotional or physical.

[¶20] As required by N.D.C.C. § 27-19.1-01(5) and 25 U.S.C. § 1912(f), the juvenile court determined whether continued custody of the children by B.V. would likely result in serious emotional or physical damage to the children.

[¶21] ICWA also requires this finding to be supported by evidence, including testimony of qualified expert witnesses. N.D.C.C. § 27-19.1-01(5); 25 U.S.C. § 1912(f). B.V. argues the juvenile court erred in terminating his parental rights because the testimony of the qualified expert witness was insufficient to satisfy the requirements of ICWA.

[¶22] Marilyn Poitra, the ICWA coordinator qualified at the hearing as an expert witness, testified during B.V.'s trial. Based on her review of B.V.'s case, Poitra testified that the Tribe agreed with terminating B.V.'s parental rights. Poitra was asked whether the Tribe would keep his rights intact should he be released by the end of the year to which she answered in the negative as there is no evidence or likelihood that he would be released soon. She further testified that based on B.V.'s incarceration and inability to be with or provide for the children for many years would cause instability and lack of permanency. Poitra explained that termination of B.V.'s parental rights would facilitate such permanency and stability as the children could be adopted in a few months. We conclude this testimony is sufficient to support the juvenile court's finding that continued custody of the children by B.V. would likely result in serious physical or emotional damage to them.

[¶23] While Poitra's testimony was limited, we find that ICWA does not clarify the scope of the expert testimony required, nor does it require that the expert testimony provide the sole basis for the juvenile court's finding. *In re K.B.*, 2021 ND 106, ¶ 10, 961 N.W.2d 293 (citing to *Marcia V. v. State*, 201 P.3d 496, 508 (Alaska 2009) (holding the qualified expert witness testimony must be "some of the evidence" supporting findings in an ICWA termination matter, but "does not need to be the sole basis for that finding; it simply must support it")). The evidence in its totality shows that based on B.V.'s lengthy incarceration, he will be unable to care for the children, unable to provide financial support or housing, and cannot meet parenting responsibilities for a significant amount of time.

8

[¶24] Based on the record before us, we conclude that there was substantial evidence from which the juvenile court could find beyond a reasonable doubt that continued custody by B.V. was likely to cause serious emotional or physical damage to the children. The court did not misapply the law and we are not left with a definite and firm conviction a mistake has been made. The finding was not clearly erroneous.

V

[¶25] There is evidence in the record to support the juvenile court's finding that the Zone made active efforts to prevent the breakup of B.V.'s family, the court did not misapply the law, we are not left with a definite and firm conviction a mistake has been made, and we conclude the finding is not clearly erroneous. There was substantial evidence from which the court could find beyond a reasonable doubt that continued custody by B.V. was likely to cause serious emotional or physical damage to the children, the court did not misapply the law, we are not left with a definite and firm conviction a mistake has been made, and we conclude the finding was not clearly erroneous. The order terminating B.V.'s parental rights to the children is affirmed.

[¶26] Jon J. Jensen, C.J.
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte
Douglas A. Bahr